IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| AVENUE C APARTMENTS, LLC, a Montana limited liability company, | CV 19-37-BLG-SPW-TJC |
| Plaintiff/Counter-Defendant, | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| vs. | |
| THE CINCINNATI INSURANCE COMPANY, a corporation; and JOHN DOES 1-10, | |
| Defendant/Counter-Claimant. | |

Plaintiff Avenue C Apartments, LLC ("ACA") brought this action against Defendant Cincinnati Insurance Company ("Cincinnati") for the denial of insurance coverage relating to its water damaged apartment building. (*See generally*, Doc. 1.) Before the Court is Cincinnati's Motion for Partial Summary Judgment and ACA's Cross-Motion for Partial Summary Judgment. (Docs. 34, 40.) The motions are fully briefed and ripe for review. (Docs. 35, 36, 41, 42, 45, 46, 47.) For the following reasons, the Court recommends Cincinnati's motion be DENIED and ACA's cross-motion be DENIED.

/ / /

/ / /

I.      **Factual Background**

Both parties have previously briefed the facts of this case, and the Court has recounted those facts in findings and recommendations.  (*See e.g.* Docs. 6, 10, 12, 17.)  The Court will, therefore, limit discussion to facts relevant to the issue at hand; all facts are undisputed unless otherwise noted.

ACA initiated construction on a 126-luxury apartment building in Billings, Montana, in November 2015 and substantially completed the project by October 2017.  Jackson Contractor Group, Inc. (JCG) was the general contractor for the project.  Cincinnati provided ACA with insurance coverage between August 8, 2017 and August 8, 2018, under policy # ECP 045 50 20/EBA 045 50 20 ("Policy").

During the winter of 2017/2018, accumulated snow and ice on the apartment's roof melted and caused water damage to the top (4th) floor and portions of lower floors.  Water penetrated the roof membrane, damaged the roof decking, and soaked underlying insulation between the decking and the 4th floor ceiling.  Water also ran down walls and damaged insulation and drywall. Ultimately, the water damage caused or contributed to condensation and mold, causing further damage, and required restoration.

ACA submitted a property loss notice to Cincinnati in March 2018, marking the approximate date of loss as January 5, 2018.  To date, it appears Cincinnati has

not provided any coverage for ACA's claimed damages.  Currently, the parties dispute whether coverage exists under the Policy's defective work exclusion, among other provisions.  Cincinnati also asserts that rainstorms in July 2017 also contributed to water damage and mold during construction; ACA disagrees with the assertion.

ACA subsequently filed the instant suit alleging breach of contract, violations of Montana's Unfair Trade Practices Act, and constructive fraud/breach of fiduciary duties.  (Doc. 1.)  Cincinnati answered, and asserted a counterclaim for declaratory judgment that ACA's damages and losses are not covered under the Policy.

## II.     Legal Standard

### A.     Summary Judgment

Typically, the standards for summary judgment are set out in boilerplate fashion at the beginning of any motion or order on summary judgment.  But the standards are particularly important to resolution of the issues here.

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a

material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of

the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

When parties file cross-motions for summary judgment, the Court reviews each motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.   Declaratory Judgment

Under the *Erie* Doctrine, "federal courts exercising diversity jurisdiction must follow state substantive law and federal procedural law when adjudicating state law claims." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020). Declaratory relief under the federal Declaratory Judgment Act is procedural in nature. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, (1950) ("(T)he operation of the Declaratory Judgment Act is procedural only." (internal citation omitted, alteration original)); *Golden Eagle Ins. Co. v. Travelers Companies*, 103 F.3d 750, 753 (9th Cir. 1996), overruled on other grounds by

5

*Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) ("The

Declaratory Judgment Act, 28 U.S.C. § 2201, is the procedural statute under which

a federal court determines whether to exercise its jurisdiction to hear a case . . .");

*Kolstad v. Trinity Universal Ins. Co. of Kansas*, 12 F. Supp. 2d 1101, 1104 (D.

Mont. 1998) (same).  Thus, the Court will apply the federal Declaratory Judgment

Act, 28 U.S.C. § 2201, to Cincinnati's counterclaim.

### C.    Montana Insurance Law

As noted above, since the Court's jurisdiction over this action is based on

diversity of citizenship, the Court must apply the substantive law of Montana.  *In

re Cty. of Orange*, 784 F.3d 520, 523-24 (9th Cir. 2015).  In Montana, the

interpretation of an insurance contract is a question of law.  *Scentry Biologicals,

Inc. v. Mid-continent Cas. Co.*, 319 P.3d 1260, 1264 (Mont. 2014).  A court

interpreting an insurance policy is to read the policy as a whole and, to the extent

possible, reconcile the policy's various parts to give each meaning and effect.

*O'Connell v. Liberty Mut. Fire Ins. Co.*, 43 F.Supp.3d 1093, 1096 (D. Mont. 2014)

(*citing Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d

1021 (Mont. 2008)).  The terms and words used in an insurance policy are to be

given their usual meaning and construed using common sense.  *Hardy v.

Progressive Specialty Ins. Co.*, 112, 67 P.3d 892, 896 (Mont. 2003).  Any

ambiguities in the insurance contract are construed against the insurer and in favor

6

of extending coverage. *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*,
206 P.3d 919, 929 (Mont. 2009). "An ambiguity exists when the policy, taken as a
whole, is reasonably susceptible to two different interpretations." *Heggem v.
Capitol Indem. Corp.*, 154 P.3d 1189, 1193 (Mont. 2007). But a court should not
"seize upon certain and definite covenants expressed in plain English with violent
hands and distort them so as to include a risk clearly excluded by the insurance
contract." *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108
P.3d 469, 474 (Mont. 2005). Moreover, "a court may not create an ambiguity
where none exists, nor may a court rewrite an insurance policy by ignoring clear
and unambiguous language to accomplish a 'good purpose.'" *Heggem*, 154 P.3d at
1193.

## III.    Discussion

### A.    Cincinnati's Motion for Partial Summary Judgment

Cincinnati moves the Court for partial summary judgment, seeking the
interpretation of certain Policy provisions to determine ACA's coverage. (Doc.
34.) Cincinnati advances multiple arguments relating to property damage
coverage, as well as business income and extra expense coverage.

First, as to property damage coverage, Cincinnati argues that (1) the Policy
excludes coverage for the cost of repairing defective construction work; (2) the
Policy excludes loss resulting from water seepage, leakage, or condensation

7

occurring over a period of 14 days; (3) any coverage for losses caused directly or indirectly by mold is limited to $15,000; and (4) the fungi exclusion is an anti-concurrent exclusion.  (Doc. 35 at 10, 12, 14, 17.)

Second, Cincinnati asserts that there is no business income and extra expense coverage for (1) the period of repair necessary to correct defective workmanship; (2) water seepage occurring more than 14 days; and (3) suspension of business operations caused by mold for a period longer than 30 days.  (*Id.* at 18-21.)

### 1.      Property Damage Coverage

#### a.      Defective Construction Work

In the parties' joint statement of stipulated facts, it was agreed that "[t]here is no coverage for the cost of repairing the defective work of JCG and the other contractors."  (Doc. 28 at 3.)  From this stipulation, Cincinnati seeks a declaration that the policy excludes coverage of the cost of repairing the following:

> 1. The Policy excludes coverage for the costs of repairing the defective work of JCG and the other contractors.
>
> 2. The Policy does not provide coverage for the cost of repairing the roof assembly as described in the CDA report.
>
> 3. The Policy does not provide coverage for the cost of repairing the lap sided exterior wall assembly as described in the CDA report.
>
> 4. The Policy does not provide coverage for the cost of repairing the scuppers.

5. The Policy does not provide coverage for the cost of eliminating the gap in the insulation between the roof and 4th level sheetrock ceiling.

(Doc. 35 at 11-12.)

The Court finds that Cincinnati has failed to sustain its initial burden of establishing the absence of a genuine issue of material fact with respect to the requested declarations on defective workmanship coverage issues.

The party moving for summary judgment must show that a particular fact cannot be genuinely disputed by "citing to particular parts of materials in the record, including deposition, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . . Fed. R. Civ. P. 56(c)(1)(A).  Local Rule 56.1 implements Rule 56 by requiring a party moving for summary judgment to simultaneously file a Statement of Undisputed Facts (SOUF) which must:

> (1) set forth in serial form each fact on which the party relies to support the motion; [and]
>
> (2) pinpoint cite to specific pleading, deposition, answer to interrogatory, admission or affidavit before the court to support each fact . . .

Here, Cincinnati's SOUF offers very few facts on the issue of faulty workmanship, and how it may relate to the various coverage claims.

/ / /

### i.     Roof Assembly

With respect to the costs for repairing the roof, Cincinnati's SOUF offers very limited information relative to any defective workmanship in the construction of the roof, and what measures are necessary to correct those defects.  Cincinnati references that "scuppers" on the roof were blocked by ice, allowing water to back up and enter the building through "improperly sealed openings around the scuppers." (Doc. 36 at ¶ 9.)  The SOUF also references the opinion of Cincinnati's claims adjuster that the building contractors "omitted roof deck insulation and placed inadequate batt insulation between the roof and the 4th level sheetrock ceiling." (*Id.* at ¶ 15.)  The SOUF also refers to a report from Collaborative Design Architects (referred to as the "CDA report"). (*Id.* at ¶ 22.)  The SOUF briefly sets out recommendations made in the report to "repair the roof assembly." (*Id.* at ¶ 23.)

Thus, Cincinnati's SOUF asserts there are certain defects in the sealing around scuppers and with the placement of insulation.  It also references that the CDA report provides for needed repairs.  (Doc. 36 at ¶ 23.)  But these allegations certainly do not establish the absence of any issue of material fact that all repairs to the roof were related to defective work, or that the defective work exclusion excludes coverage for the cost of repairing the entire "roof assembly."

10

In its response brief, Cincinnati also relies on a letter from ACA's attorney to Cincinnati's adjusters, demanding payment for the cost of repairs set forth in the attached CDA report.  (Doc. 45 at 17-18.)  ACA objects to the use of the letter and attachment on the grounds it was a statement made during negotiations about the claim, and therefore not admissible evidence under Fed. R. Evid. 408.  (Doc. 42 at ¶ 25.)  But regardless of its admissibility, or whether it may be properly considered under Fed. R. Civ. P. 56, the letter and report are still inadequate to establish the absence of any issue of material fact that replacement of the entire roof assembly is due to faulty workmanship.  (See Doc. 36-1.)

The report appears to relate to the warrantability of the roof, and recommendations for corrective action for the apartment building.  (Doc. 36-1 at 4-8.)  The report notes that certain components of the roof were installed per manufacturer guidelines, while others were not.  (Doc. 36-1 at 4, ¶¶ 1, 4.)  It also states that a manufacturer's inspection of the roof installation was not done.  (*Id.* at ¶ 3.)  It concludes that, because of the deviations from the manufacturer instructions and the absence of a manufacturer's warranty inspection, the manufacturer would not issue a warranty.  (*Id.* at 5, ¶ 5.)  Additionally, the report documents certain damage to the roof which would necessitate the replacement of the "protective roof membrane."  *(Id.* at 4, ¶ 4.)*

Nevertheless, even assuming the report can be construed to document defective workmanship, and that certain repairs or corrective actions needed to be done to the roof, it does not establish what portion of those repairs may be covered under the Policy.

As ACA points out, the Policy exclusion relative to construction defects is subject to a "resulting loss clause," which provides that "if an excluded cause of loss . . . results in a Covered Cause of Loss, [Cincinnati] will pay for that portion of 'loss' caused by that covered Cause of Loss." (Doc. 42-3 at 54.)[1]  Cincinnati acknowledges that ensuing losses from faulty construction may be covered. (Doc. 35 at 11; Doc. 45 at 20.)

This Court considered a similar ensuing loss clause in *Leep v. Trinity Universal Company*, 261 F.Supp.2d 1071 (D. Mont. 2017).  Like here, the policy in *Leep* had an exclusion for defective workmanship, but the exclusion also contained an ensuing loss provision. *Id.* at 1078-79.  The Court noted that ensuing loss provisions generally operate as an exception to the policy exclusion, and ultimately concluded that while the cost of remediating defective work is not covered, any "subsequent covered loss that occurs as a consequence or result of the faulty workmanship" is covered. *Id.* at 1085.

---

[1] Cincinnati did not provide a copy of the Policy in connection with the motion, but it is attached to the declaration of Elizabeth A. Brennan. (Doc. 42-3.)

Cincinnati has not offered any facts to established what portion of the necessary repairs to the roof assembly are required to correct defective workmanship, and which are required to repair damage caused by a covered loss that occurred as a result of those defects.  Without those facts, it cannot be determined that what portion of the cost of "repairing the roof assembly as described in the CDA report" may be covered.

### ii.    Wall Assembly

Cincinnati's SOUF provides even less support for the proposition that the cost of repairing the "lap sided exterior wall assembly" is excluded by the defective work exclusion.  In fact, the exterior wall assembly is not mentioned in Cincinnati's SOUF, other than to state that it was recommended for repair in the CDA report.  (Doc. 36 at ¶ 24.)  Neither the SOUF nor the CDA report make any statement – much less provide evidence – that the repairs were needed to the wall assembly because of faulty installation as opposed to an ensuing loss.

### iii.    Scuppers

Although not well defined or explained, the roof of the apartment building was drained, at least in part, using "scuppers."  Cincinnati seeks a declaration that the defective work exception excludes the cost of repairing the scuppers.  But Cincinnati's request is unsupported by facts set forth in its SOUF.  One statement of fact suggests the openings around the scuppers

were improperly sealed.  (Doc. 36 at ¶ 9.)  This statement implicates both ice

blockage and improperly sealed openings around the scuppers as causes of

water infiltration, but it fails to address what is defective with the scuppers.

Cincinnati also does not explain what repairs are necessary to the scuppers

and how those repairs are necessitated by faulty workmanship.

### iv.    Gap in Insulation

Regarding the requested declaration that there is no coverage for the cost of

repairing the gap in the insulation, Cincinnati advances the following statement of

fact:

> Mr. Stone's inspection revealed that during the construction of the
> building, JCG or its contractors omitted roof deck insulation and placed
> inadequate batt insulation between the roof and 4th level sheetrock
> ceiling. The architect of record, William J. Haynes of Collaborative
> Design Architects ("CDA") stated the original building design required
> the contractor to install insulation to completely fill the space between
> the underside of the roof and the top of the ceiling sheetrock.

(Doc. 36 at ¶ 15.)  In support, Cincinnati cites generally to the affidavit of its

claims adjuster, George Stone.  (*Id.*, citing Doc. 36-2.)  ACA does not admit or

deny the statement, but instead objects to it as hearsay not within any exception,

and thus asserts it is inadmissible for purposes of summary judgment under Fed. R.

Civ. P. 56(c)(4).  (Doc. 42 at ¶ 15.)

Hearsay is "a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter

14

asserted."  Fed. R. Evid. 801(c).  "Hearsay is inadmissible unless it is defined as non-hearsay under Fed. R. Evid. 801(d) or falls within a hearsay exception under Rules 803, 804 or 807."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002).  As discussed above, only admissible evidence may be considered under Fed. R. Civ. P. 56.  *Id.* at 773.

Here, the above statement of fact (and George Stone's averment in Doc. 36-2, ¶ 7) consists of two parts.  The first sentence is not hearsay and is admissible. Stone, who investigated and adjusted ACA's claim for McLarens, avers personal knowledge through his inspection that "JCG or its contractors omitted roof deck insulation and placed inadequate batt insulation between the roof and 4th level sheetrock ceiling."  (Doc. 36-2 at ¶ 7.)  ACA does not dispute his personal knowledge.

But the second part of the statement is hearsay.  Stone, as declarant, clearly represents an out of court declaration made by a third party, William J. Haynes, which is offered to prove the truth of the matter asserted – that "the original building design required the contractor to install insulation to completely fill the space between the underside of the roof and the top of the ceiling sheetrock." (Doc. 36-2 at ¶ 7.)  Thus, the statement is inadmissible, and cannot be considered for purposes of the present motion.

Thus, while it is undisputed that, in Stone's opinion, "JCG or its contractors omitted roof deck insulation and placed inadequate batt insulation between the roof and 4th level sheetrock ceiling," the second half of the statement attributable to Mr. Haynes implicating a gap in insulation is inadmissible.  Other statements of fact attempting to establish a gap in insulation likewise fail on grounds of hearsay.  (*See* Doc. 42 at ¶ 16 ("Mr. Haynes said …").)  Because Cincinnati's requested declaration focuses on "the cost of eliminating the gap in the insulation," a failure to establish that a gap exists, or that any gap is related to faulty workmanship, is plainly material.

In sum, Cincinnati has failed to meet its burden under the summary judgment standard or the requirements for declaratory judgment in support of its requested declarations relative to the defective work exclusion

### b.    Water Seepage, Leakage, or Condensation

Cincinnati argues that the Policy excludes loss resulting from water seepage or leakage over a period of 14 days or more.  (Doc. 35 at 12.)  Cincinnati asserts that multiple construction defects allowed water to enter the building, causing damage, and therefore the Policy provision limiting coverage for loss caused by water seepage applies.  (*Id.* at 12-13; Doc. 45 at 15.)  To that end, Cincinnati requests that the Court adopt the following definitions relating to water seepage, leakage, or condensation:

16

1. Water entering the interior of a building through a defectively constructed building is seepage or leakage as those words are used within this exclusion.

2. Damage caused by seepage or leakage of water that occurs over a period of 14 days or more is excluded from coverage.

3. There is no coverage for damages caused by the condensation that formed between the roof and 4th level sheetrock ceiling.

(*Id.* at 13.)

Similar to its request for declarations related to construction defects, Cincinnati has not met its initial burden of proof under summary judgment standards to enable the Court to make any declaration with respect to the water seepage limitation in the policy.  In fact, Cincinnati concedes that the parties disagree as to how the water entered the building, and that there are questions of fact regarding the duration of any seepage in the building.  (Doc. 35 at 13.) Cincinnati "believes seepage through [] some of the scuppers occurred at various time[s] more than 14 days before the ice dam event."  (*Id.*)  ACA disputes this assertion and provides the declaration of a forensic architect that the water event likely lasted less than seven days.  (Doc. 42 at ¶ 6; 42-1 at ¶ 9.)  Therefore, there is clear dispute as to material facts relevant to the application of the water seepage limitation, and it is not at all clear whether the limitation even applies.

Moreover, with respect to the third requested declaration, the Court is unable to discern what damage Cincinnati alleges was caused by the alleged condensation.

There are plainly issues of fact as to what damage, if any, was caused by the alleged condensation, as opposed to a sudden water event.  ACA's expert opines, for example, that saturation from the water event would have necessitated replacement of insulation, regardless of any condensation, and that various repairs would have been necessary independent of the potential for mold.  (Docs. 42; 42-1 at ¶¶ 8, 12)

Accordingly, summary judgment should not be granted on Cincinnati's request to adopt definitions and rule as a matter of law on the application of the Policy's water seepage provisions.

### c.    Fungi/Mold Coverage Limitation

Next, Cincinnati asserts that since ACA seeks coverage for the cost to remediate mold caused by water infiltration and condensation, any coverage for losses caused directly or indirectly by mold is limited to $15,000.  (Doc. 35 at 14.) ACA argues, among other things, that Cincinnati has not met its burden establishing the "fungi" exclusion applies.  (Doc. 41 at 23-24.)  The Court agrees with ACA.

 Cincinnati has again failed to establish the absence of any genuine issue of material fact as to the applicability of the coverage provisions for mold or of any limitation on such coverage.  Cincinnati acknowledges that coverage for mold under the policy only exists if the mold is the result of a "covered cause of loss"

that occurs during the "coverage term." (Doc. 35 at 16.) Cincinnati also "acknowledges that there may be questions of fact as to whether the mold resulted from a covered loss." (*Id.*) Nevertheless, Cincinnati requests the court to rule on the coverage available "to the extent coverage exists."

Again, Cincinnati has not met its burden under Rule 56. It has not, as Rule 56 requires, established the absence of any issue of material fact to allow the Court to enter judgment as a matter of law on the application of mold provisions in the policy. If, as Cincinnati apparently alleges, there is no coverage for mold because it did not result from a covered loss, the limitations on coverage are entirely irrelevant.

Thus, summary judgment is inappropriate as to coverage for losses caused directly or indirectly by mold.

### d.   Fungi Anti-Concurrent Causation Exclusion

Cincinnati asks the Court to rule the mold exclusion is an anti-concurrent causation exclusion with a $15,000 limit, such that once the limit is reached there is no further coverage for costs incurred to repair water damage and remediate mold. (Doc. 35 at 18.)

As the Court discussed above, however, Cincinnati has failed to establish the absence of any issue of material fact as to the applicability of the mold coverage provisions. To the contrary, Cincinnati acknowledges that there are issues of fact

as to whether it applies and, in fact, appears to take the position that coverage does not exist for fungi/mold.  (*Id.* at 16, 17-18.)  Cincinnati does not remedy this shortcoming in the instant argument.

In summary, Cincinnati's motion for partial summary judgment as to Property Damage Coverage falls short of the requirements of Fed. R. Civ. P. 56, and Local Rule 56.1.  The Court finds that Cincinnati has failed to meet its burden of proof on its requested declarations and recommends the motion be denied.

## 2.    Business Income and Extra Expense Coverage

Cincinnati also asserts that there is no business income and extra expense coverage for (1) the period of repair made to correct defective workmanship; (2) water seepage occurring more than 14 days; and (3) suspension in business operations for a period longer than thirty days caused by mold.  (Doc. 35 at 18-21.)

### a.    Period of Repair for Defective Workmanship

Cincinnati asks the Court to rule that there is no coverage for lost business income, lost rental value, or extra expenses that were the result of a suspension of ACA's operations during the period of repair for defective construction and workmanship.  (Doc. 35 at 20.)

ACA asserts that Cincinnati has failed to meet its burden to show coverage is excluded and thus seeks an advisory opinion.  (Doc. 41 at 32-33.)  ACA points to Cincinnati's Preliminary Pretrial Statement in which an admission is made that

20

lost business income *may* be owed but the amount has not yet determined.  (*Id*. at 33, citing Doc. 27 at 31-32 ("CIC needs further information regarding ACA's claims to determine to the extent to which there may be coverage.").)[2]  ACA also addresses the merits of Cincinnati's arguments, but the Court need not entertain them.

Cincinnati fails to offer any facts in support of its request for declaratory judgment on the period of repairs necessary to correct defective workmanship.  As discussed in previous sections, questions of fact remain as to the specifics of any defective workmanship and, here, Cincinnati proffers no additional facts relating to the extent of needed repairs, certain or estimated dates and costs of repair, how the repairs were necessitated by defective workmanship, or other potentially material facts.

Cincinnati has not established that the undisputed facts show it is entitled to judgment as a matter of law.

/ / /

/ / /

/ / /

---

[2] ACA renews its argument that the Policy provisions for business income and extra expense fail under Montana's Property and Casualty Insurance Policy Language Simplification Act, Mont. Code Ann. 33-15-333 to -340.  Again, this argument will be discussed as part of ACA's Cross-Motion for Partial Summary Judgment, *infra*.

### b.    Coverage for Suspension of Operations for Water Seepage or Leakage

Cincinnati requests the Court make a declaratory ruling relating to the Policy provision limiting coverage for water seepage or leakage occurring for a period longer than 14 days.  (Doc. 35 at 20-21.)  Cincinnati admits there are factual disputes regarding the duration of seepage, but asks the Court to rule that there is no lost business income, lost rental value, or extra expense coverage for the suspension of operations during repairs for loss caused by water seepage longer than 14 days.   (*Id.*)

Again, the Court need not reach the interpretation of the water seepage or leakage exclusion, because Cincinnati has not met its burden to show on undisputed facts that the provision is even applicable.

### c.    Coverage for Suspension of Operations for Mold

Cincinnati asks the Court to make three rulings related to the Policy provision covering the suspension of business operations during mold remediation: (1) ACA has the burden to prove coverage under the Business Income, Rental Value, or Extra Expense Coverage extension, citing *Travelers Casualty and Surety Co. v. Ribi Immunochem Research.*, 108 P.3d 469, ¶ 31 (Mont. 2005); (2) to establish coverage, ACA must show that mold remediation caused by water seepage occurred under 14 days and caused the suspension of business aside from the period of repair for construction defects and other noncovered causes; and (3) if

22

there is coverage under this extension, it is limited to 30 days of lost business income or extra expense.  (Doc. 35 at 21-23.)

As with other coverage issues relating to mold, however, Cincinnati has not set forth undisputed facts to show that the coverage limitation applies.  Nor has Cincinnati set forth any facts to establish that business operations were actually suspended because of mold remediation.

Cincinnati's request in this regard is emblematic of the deficiencies in its motion.  A declaration under 28 U.S.C. § 2201 has the "force and effect of a final judgment or decree and shall be reviewable as such."  It is not a mechanism to obtain preliminary rulings on legal issues of interest to the parties.  As noted in the Advisory Committee Notes to Fed. R. Civ. P. 57, "[a] declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts."  This standard is in accord with the case cited by Cincinnati to support its argument that declaratory relief is appropriate here, *Park Plaza Condominium Assoc. v. Travelers Indemnity Co. of Am.*, 2017 WL 6040819 (D. Mont. Dec. 6, 2017).  There, this Court found declaratory relief was appropriate because "[a] declaratory judgment in this case would determine the coverage dispute between the parties, and as such, there is a case or controversy at issue and granting declaratory judgment would not be an advisory opinion."  *Id.* at *2.  That is not the case here.  A determination of the legal issues presented by

23

Cincinnati's motion will not "terminate the controversy" nor "determine the coverage dispute" between the parties.  It will simply provide advisory legal opinions on issues which ultimately may or may not be relevant.

Further, Rule 57 also makes it clear that the Federal Rules of Civil Procedure "govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201."  Therefore, to obtain summary judgment, or partial summary judgment, it must be done under the framework of Fed. R. Civ. P. 56, which as noted multiple times above requires the moving party to show the absence of a genuine dispute as to any material fact and the party's entitlement to judgment. Cincinnati has not done so here, and readily acknowledges at the outset of its briefing that "questions of fact prevent final determination of all coverage claims." (Doc. 35 at 4.)  Therefore, instead of seeking a final determination on the coverage claims, it seeks the Court's ruling on certain issues to "help frame and resolve some of the factual issues."  That is not a proper use of either Rule 56 or 57, and Cincinnati's motion should be denied.

Therefore, the Court recommends Cincinnati's Motion for Partial Summary Judgment as to Business Income and Extra Expense Coverage be denied in all respects.

It is further recommended that Cincinnati's motion be denied in its entirety.

/ / /

24

### B.     ACA's Cross-Motion for Partial Summary Judgment

ACA asks the Court to enter partial summary judgment in two respects, that: (1) the Policy's limitations violate Montana's Property and Casualty Insurance Policy Language Simplification Act ("Simplification Act"), and (2) the Policy sub-limits on mold are irrelevant, unenforceable, or, alternatively, in addition to the Policy's limits set forth in the declarations.  (Doc. 40.)

As to the Simplification Act, ACA argues that the Policy fails to adhere to the Act's minimum policy specifications.  (Doc. 41 at 13-14.)  ACA asserts two flaws in the Policy: (1) the Policy's exclusions and limitations violate § 33-15-337(4), which requires a specified minimum font size, and (2) the Policy failed to provide notice of two critical provisions, as required by § 33-15-337(2); specifically the $15,000 sublimit and the 30-day business loss limitation for mold. (*Id.* at 15-16.)

ACA's argument in support of its second ground for partial summary judgment—the Policy's sub-limits on mold (*see* Doc. 40)—is less clear, and there is no standalone discussion in ACA's briefing on this issue.  It therefore appears that ACA's argument in relation to enforceability is included in the above argument relating to the Simplification Act.

Accordingly, the Court will address ACA's argument under the Simplification Act.

### 1. Property and Casualty Insurance Policy Language Simplification Act

#### a. Font Size of Policy Exclusions and Limitations

ACA proffers a single statement of fact in support of its argument relative to font size: "Cincinnati raises various policy provisions in this case, in which the heading or title of those provisions is in size 10.5 font and the text is in size 9.5 font." (Doc. 42 at 13, ¶ 15.) ACA argues that this runs afoul of the Simplification Act, which requires policy provisions to be "printed in not less than 10-point type, 1-point leaded." Mont Code Ann. 33-15-337(4). (Doc. 41 at 15.)

In support, ACA cites generally to the Declaration of Elizabeth Brennan. (*Id.*; Doc. 42 at 13, ¶ 15.) Brennan avers that ACA requested that she review the Policy to determine font size; she relied on Adobe Acrobat Pro and Microsoft Word to determine font size of various parts of the Policy; and she determined that those font sizes do not meet the requirements of the Act. (Doc. 42-3 at ¶¶ 3-7.)

Cincinnati objects to consideration of Brennan's opinion on various grounds, including that ACA fails to show how Brennan is qualified to opine on the issue. (Docs. 45 at 9-10; 46 at ¶ 16.) The Court agrees.

Under Fed. R. Evid. 702, an expert must be qualified "by knowledge, skill, experience, training, or education," and if so, then they "may testify." The first element of Rule 702 evaluates the proffered expert's qualifications and is a threshold issue. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813,

814 (9th Cir. 2014); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular scientific field …")  It is within the discretion of the court to determine whether a witness is competent to testify as an expert.  *United States v. Pino*, 606 F.2d 908, 918 (10th Cir. 1979).  Moreover, "a court has the discretion to find expert testimony inadmissible—or decline to consider expert testimony on summary judgment—where it is unreliable or misleading.  *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1045–46 (N.D. Cal. 2011)

Here, ACA has not established Brennan is qualified or has expertise in fonts, typography, printing, publishing, graphic design or the like.  Brennan avers that she is an attorney licensed to practice law in Montana and is a law professor there. (Doc. 42-3 at ¶ 2.)  No mention of specific knowledge, skill, experience, training, or education is given on the specialties mentioned above; Brennan's averment that she is familiar with Adobe Acrobat Pro and Microsoft Word does not qualify as expertise.  (*Id.* at ¶ 4.)  Further, familiarity with those common programs speaks to the tools and methods Brennan employed to determine font size.  But the Court can only reach reliability of Brennan's averred methods if her qualifications warrant further analysis of Rule 702's elements and application of the *Daubert* factors.

27

See, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589-90 (1993).  The

Court need not proceed if her qualifications fall short first and foremost.

The Court is unconvinced that Brennan's specific knowledge, skill,

experience, training, or education translates into the sort of qualification Rule 702

contemplates.  In *Strubel v. Capital One Bank*, for example, the plaintiff relied

upon the report of expert typographer Thomas Phinney to determine font

characteristics in an action challenging compliance with the Truth in Lending Act

("TILA") (15. U.S.C. § 1601 *et seq.*).  *Strubel v. Capital One Bank (USA), N.A.*,

179 F. Supp. 3d 320 (S.D.N.Y. 2016); see Exp. Rep. Thomas Phinney, 2015 WL

11921260 (S.D.N.Y.).  The Court looked to Phinney's report to explain the

remarkably technical inquiry into font size.  *Id.* at 326, 328-329.  Like the

Simplification Act at issue here, TILA featured a minimum 10-point font for credit

card solicitation disclosures.  *Id.* at 322, 325.

*Strubel* is informative here if only because Phinney's report illustrates a high

level of "scientific, technical or other specialized knowledge" involved in

typographical forensics, which assisted the *Strubel* Court in its determination of

whether the credit card solicitation at issue conformed to TILA's font standards.

Brennan's explanation of font size here, on the other hand, offers no special

knowledge to help the Court to determine this fact.  Without further foundation,

expertise of font size appears to be outside of the confines of Brennan's averred specialized knowledge in the area in law and teaching law.

Therefore, Cincinnati's objection is well-taken, and Brennan's declaration should be excluded from consideration in connection with ACA's cross motion for summary judgment. Accordingly, ACA has failed to establish the absence of material fact as to the font size of the Policy's exclusions and limitations.

### b.   Notice of Critical Provisions

ACA further argues that the Policy violates Mont. Code Ann. § 33-15-337(2)'s requirement that the Policy provide notice of important provisions, because it failed to provide notice of the $15,000 sublimit for mold and the 30-day business loss limitation for mold. (Doc. 41 at 16.) Relying on the Montana Supreme Court's decision in *Montana Petroleum Tank Release Compensation Board v. Crumley's, Inc.*, 174 P.3d 948 (Mont. 2008), ACA argues that the policy fails to provide a "notice section of important provisions." (*Id*.)

As discussed above, Cincinnati's motion with respect to the mold/fungi coverage provisions fails because Cincinnati did not sustain its burden to show the provision was applicable to the current dispute or that any claims had been made to trigger the $15,000 sublimit or the 30-day business loss limitation. ACA's motion fares no better. The only additional facts included in ACA's SOUF relative to mold was "[t]o the extent there is mold in areas of the building, it was largely

caused by the sudden and unexpected intrusion of water from snowmelt," and that the "various repairs were necessary independent of the potential for mold." (Doc. 42 at ¶¶ 10, 12.)  Rather than place the coverage provisions at issue, these allegations negate the application of the mold coverage provisions.

Additionally, this case is substantially different from the Montana Supreme Court's *Crumley's* decision.  *Crumley's* involved an action to recover the costs of cleanup and corrective action for a leak from an underground diesel fuel tank. *Crumley's*, 174 P.3d at 953-54.  The owner of the tank maintained commercial liability coverage, which included an extension of coverage for pollutants.  *Id.* at 954.  But the coverage extension contained a notice provision which required the insured to report any damage or loss to the insurer within 120 hours of the occurrence or loss.  *Id.*  The insurer ultimately denied coverage, citing the owner's failure to give timely notice under the 120-hour notice requirement.  *Id.*, 959.

The Montana Supreme Court determined that the policy violated the Simplification Act, Mont. Code Ann. § 33-15-337(2), which requires that a policy "include a table of contents and notice section of important provisions."  *Id.* at 959. The Supreme Court found that the insurer's failure to highlight the 120-hour notice provision in a table of contents or notice section was a violation of the Act and, accordingly, held the notice provision was void and unenforceable because it was contrary to statute.  *Id.*, 960.

The court's decision in *Crumley's* did not elaborate further on what provisions are sufficiently "important" to require mention in a table of contents or notice provision.  As Cincinnati points out, any number of provisions in an insurance contract may ultimately prove to be important, depending on the circumstances and nature of the claim.  (Doc. 45 at 12-13.)  Clearly, a provision in an insurance contract requiring strict compliance with a very short notice period to avoid the termination of all coverage under the policy is such an important provision.  The answer is not as clear with the limitations on mold coverage at issue here.  The fungi/mold coverage provisions are an extension of coverage, which requires no action by the insured to implement or maintain the coverage.

Moreover, unlike in *Crumley's*, the fungi/mold provisions here were identified in the table of contents for the "Building and Personal Property Coverage Form."  Under "Coverage Extension," the table of contents identifies coverage for "Fungi, Wet Rot, Dry Rot, and Bacteria – Limited Coverage."  (Doc. 42-3 at 46).  This provides sufficient notice to an insured that there is limited coverage for fungi/mold and directs the insured to the coverage provision where those limitations are contained.  (*Id.* at 67-68.)

Therefore, ACA's motion for summary judgment with respect to the Simplification Act should be denied.

/ / /

31

**IV.   Conclusion**

Based on the foregoing, it is **RECOMMENDED** that Cincinnati's Motion for Partial Summary Judgment (Doc 34) and ACA's Cross-Motion for Partial Summary Judgment (Doc. 40) be **DENIED** in all respects.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED**.

DATED this 25th day of February, 2021.

TIMOTHY J. CAVAN
United States Magistrate Judge